## THE BALTIMORE AND NEW YORK RAILROAD COMPANY

### *v.*

### JOHN VERNOU BOUVIER, JR., ELIZABETH H. HUME et al.

[Submitted December 30th, 1905.    Decided January 15th, 1906.]

1. Where, in partition proceedings, a master's deed was in substance and effect executed by the direction in writing of a husband and wife, and they received their share of the consideration money, they were estopped from setting up that the conveyance did not pass any interest in the land on the ground that the master's sale was void.

2. Where a railroad entered on land under a right of way deed, wherein it covenanted, among other things, to erect a passenger station and double-track its road for a certain distance, which conditions it failed to fulfill, the improvements made by the railroad on the land were not to be considered in determining, in condemnation proceedings thereafter instituted, the damages suffered by the vendor.

3. Under *2 Gen. Stat. p. 1288 § 44*, providing that "a judgment in an action of ejectment shall be conclusive as to the right of possession and the title to the premises (as the case may be) as the same has been established by such judgment," where a railroad entered upon land under a right of way deed binding it to double-track its road and to erect a passenger station on the vendor's property, which grant it thereafter forfeited by failure to comply with the terms of the deed, and a judgment in ejectment was recovered against it, that fact did not give the vendor such a new and independent title as to bar the application of equitable principles in condemnation proceedings thereinafter instituted, in determining whether or not the vendor was entitled to compensation for improvements made by the railroad prior to the forfeiture.

4. Where, in fixing the price of land conveyed to a railroad for right of way purposes, the benefit resulting to the landowner from improvements to be made by the railroad in the way of a passenger station and double

tracks was taken into consideration in fixing the compensation under the deed, the comparative value of the land with and without the advantages of such improvements was determinative of the abatement or allowance to the railroad company in fixing the price for the land conveyed.

5. Where, under a right of way deed, a railroad company covenanted to double-track its road and construct a passenger station, but it did not appear that any benefit would result to the vendor from such improvements, the road being distinctly one for the carriage of freight, a breach of such covenants by the railroad did not debar it of equitable relief, in condemnation proceedings instituted by it after declaration of a forfeiture for the breach, with respect to the allowance to the vendor of compensation for improvements already made by the road on the land.

On final hearing on bill and answers, and on cross-bill by *Bouvier* v. *Hume et al.,* and proofs.

For the previous history of the litigation between these parties, see *Bouvier* v. *Baltimore and New York Railroad Co., 65 N. J. Law (36 Vr.) 313,* and *67 N. J. Law (38 Vr.) 281,* on error, and *69 N. J. Law (40 Vr.) 149,* on *certiorari.*

*Mr. Edward Q. Keasbey,* for the complainant.

*Mr. Richard V. Lindabury,* for the defendant Bouvier.

*Mr. Walter L. McDermott* and *Mr. Charles E. Lydecker* (of the New York bar), for the heirs and devisees of William H. Hume.

PITNEY, V. C.

The complainant, on March 22d, 1889, purchased and took title from Frederick K. Reichard and William H. Hume to a strip of land (part of a much larger tract) containing five and fifty-two hundredths acres—being twenty-two hundred feet (nearly half a mile) in length and one hundred feet in width—for the purposes of its railway, and proceeded promptly thereafter to construct its railway thereon.

The conveyance, however, contained a series of clauses providing for the construction and maintenance of a double-track railway over the land conveyed, and for the erection and main-

tenance of a passenger station at one end of the strip on a small additional plot outside the one-hundred-foot strip, but included in the conveyance. The deed 'also contained clauses providing that if the grantee should fail to construct and maintain a double-track railway, then

"it shall and may be lawful to and for the parties of the first part, their heirs or assigns into and upon all and singular the lands and premises hereby conveyed, or any part thereof, to re-enter and the same to have again, repossess and enjoy as in their former estate, this conveyance or anything herein contained to the contrary thereof in anywise notwithstanding, together with all and singular the buildings, improvements, &c., with the appurtenances; subject to the covenants and conditions hereinbefore set forth, to be kept and performed by the said party of the second part, its successors and assigns, to have and to hold," &c.

The complainant constructed a double-track railway over about two-thirds of the strip only, and did not erect the passenger station.

The whole tract was subsequently, in the year 1895, subjected to partition proceedings in this court, and actually divided between the tenants in common, with the exception of the right of re-entry in the railway strip, which was sold by a master under a decree of the court, and subsequently, together with the title to some of the lands divided, became vested in the defendant Bouvier. He, early in the year 1900, brought an action of ejectment against the railway company and recovered, on the ground that the condition subsequent had not been fulfilled and that the right of re-entry reserved by 'the deed of conveyance had become vested in him.

The judgment of the supreme court was based upon the notion that the whole title was vested in him.

The complainant brought a writ of error to the court of errors and appeals and that court affirmed the judgment, but expressed the opinion that Bouvier's title extended only to one undivided half of the premises by reason of the invalidity of the master's sale and deed in partition for the strip in question, but held that, as a tenant in common, he was entitled to maintain an ejectment.

Upon the affirmance of this judgment complainant filed its

bill in this court for relief against its execution, and made the defendant Elizabeth Hume, widow and devisee of William H. Hume, former owner of one-half, and their children, parties thereto with Bouvier, on the ground that under the judicial utterance of the court of errors and appeals she was possibly, with or without her children, the owner of one undivided half of the premises.

*Interim* relief against the writ of *habere facias possessionem* was granted upon verbal condition that the complainant would take immediate proceedings to acquire, by condemnation, the title to the strip, and later on the defendants Bouvier and Hume were required to consent that the commissioners, and, in case of an appeal, the jury, should make a double finding, namely, first find the present value of the land with all the structures and improvements on it, and, second, its value without those improvements, and as if never used for railroad purposes.

This has been done.

The result was, as found by the commissioners, as follows:

| | |
|---|---:|
| The total value of land and railroad additions at the time of filing the petition for condemnation, | $8,935 72 |
| Value of lands, without railroad track, &c., as if it had never been used for railroad purposes... | 1,964 00 |
| Damages to Bouvier as owner of adjoining lands, | 500 00 |
| Damages, &c., to Hume..................... | 500 00 |

An appeal was taken and the jury found as follows:

| | |
|---|---:|
| Value of land, with railroad track and improvements ................................. | $13,212 50 |
| Value of the land without regard to railroad structure .............................. | 2,716 50 |
| Damages to Bouvier as owner of adjoining land, | 3,600 00 |
| Damages to Mrs. Hume as adjoining owner.... | 3,780 00 |

A supplemental bill was thereupon filed by complainant, setting out and attacking the binding effect of this verdict in this court, stating several grounds why the court should disregard it, and, by its own method, ascertain the proper amount to be paid, and also praying that it might be instructed as to whether the defendant Hume was entitled to any interest in the

11

award, and that pending the further proceedings in this court judgment and execution on the verdict might be stayed.

Judgment and execution was stayed upon paying a sum of money into court.

The defendants answered severally and the defendant Bouvier filed a cross-bill against the defendants Hume to establish the validity, in this court, of his title under the master's deed in partition before referred to.

This cross-bill was answered by the defendants Hume and the cause brought to a hearing.

With this brief statement of the history of the cause, I will now consider the questions raised by the pleadings.

Two questions present themselves.

*First.* Are the defendants Hume entitled to any interest in the premises?

*Second.* Upon what basis the defendant Bouvier shall be entitled to compensation.

I shall consider the question of the Humes' title first, because its solution will, as we shall see farther on, seriously affect the other question.

The railroad strip was part of a larger tract of land which was bisected by it. Reichard, one of the tenants in common at the date of the deed of conveyance to the railroad, afterwards conveyed his interest to Salter, who later on conveyed it to Sergeant and De Marmon. The result of which was that Sergeant and De Marmon became tenants in common with William H. Hume.

On May 21st, 1895, De Marmon filed his bill against his co-tenants in common for a partition of the premises. In it he set out the land conveyed to the railroad company and the condition upon which it was conveyed. To that bill William H. Hume and his wife, Elizabeth, the defendant herein, appeared, by their solicitor, Mr. N. C. J. English, and filed their answer.

On the 24th of September, 1895, the complainant filed an amended bill, praying special relief as to the railroad strip.

On the 2d of December, a decree *pro confesso* was entered against Sergeant and wife, and an order of reference to Master Atwater, to ascertain the value and the capacity of the land

to be divided, was made in the usual form, and to that order Mr. English, as solicitor for Hume and wife, consented.

Master Atwater found that the premises were capable of partition, excepting the railroad strip, and recites in his report that he was attended by the solicitor of the Humes.

On that report, which was confirmed, partition was had of all except the railroad strip, and a decree was made that the railroad strip should be sold by Master Byington, and that decree is expressly consented to by Mr. English in writing, as solicitor of Hume and his wife, and by Mr. George Biller, as solicitor of Sergeant and his wife.

The master made sale to De Marmon and Sergeant for the sum of $681, which sale was reported and duly confirmed by order dated September 22d, 1896, and the deed delivered and the purchase-money paid.

The master, since deceased, filed his statement showing what he did with that money in detail. All but $132.05 went for costs and expenses, of which latter Hume's solicitor received $16.52 and a counsel fee of $75. There was left for distribution $132.05, of which Mr. Hume received for his share $56.03, as certified to by the master.

These allowances of counsel fees were made by the court and the whole proceeding validated by a final decree dated October 13th, 1896.

It was not disputed at the hearing that Mr. English was duly authorized to appear for Mr. Hume, and his attendance as a witness was waived.

The only question raised was as to his authority to appear and represent Mrs. Hume, the defendant herein, in protection of her inchoate right of dower in the premises, and that, as I recollect, was submitted on the ordinary presumption that he was so authorized.

Mrs. Hume was not sworn as a witness, she being too ill to attend.

Mrs. Hume, the defendant herein, succeeded to the title of her husband to these premises after his death.

I think it must be presumed, from the report of the master, that he actually did pay a portion of the proceeds of the sale

to Hume or his solicitor, so that, not only did Hume authorize, through his solicitor, the sale of these premises by the master, but he actually received in person, or through his solicitor, one-half of the consideration money therefor.

Now, that the court of chancery has had and exercised, since the time of Queen Elizabeth, jurisdiction of the subject-matter of dealing with the rights of co-parceners and tenants in common in land, and decreeing partition thereof, including owelty where equal partition could not be made, seems to be undisputed, and while I do not find it necessary to assert that the decreeing of owelty to be paid by one tenant in common to the other amounts to exercising the jurisdiction of sale outright, it certainly approaches it somewhat nearly.

Be that as it may, the sale of land by this court in partition proceedings is and for many years has been clearly within the jurisdiction of this court. Its exercise is, indeed, regulated by statute, but its jurisdiction in that behalf clearly and *ex necessitate rei* includes the power to construe that statute, and if the court makes a mistake therein its decree is subject to reversal on appeal. But if not reversed on appeal, I should have thought, but for what was said by the learned judge, speaking for the court of errors and appeals, in *Bouvier* v. *Baltimore and New York Railroad Co.,* 67 N. J. Law (38 Vr.) at p. 294, that a conveyance made by order of the court in partition, and duly confirmed by the court, could not be attacked collaterally.

The substance and effect of that decision, in its ultimate analysis, is, after all, no more than this: The defendant in ejectment contended that the plaintiff's title, derived through the master's deed in partition, was void. To this the court replied, conceding that it is void, yet the plaintiff remains the owner of an equal undivided one-half part, and that is sufficient to sustain his action.

There was nothing in the decision or judgment of the court which was based thereon which could operate as an estoppel against Mr. Bouvier. The rule, as I recollect it, with regard to estoppel by record, is that it must be mutual; that one party shall not be estopped unless the other would be in case of a contrary decision. Now, as Mrs. Hume was not a party to the

record before the court of errors and appeals, she could not have been estopped by a declaration of that court that she had no interest in the land in question, hence Bouvier could not be estopped by a contrary decision.

Be that as it may, the circumstances attending the making of the decree for sale in this case were not before the court of errors and appeals, nor was that court at liberty, in that case, to deal with the title of either Bouvier or Mrs. Hume, as between them, from an equitable standpoint.

From a chancellor's standpoint the decree for sale and its execution was made, so to speak, by the direction in writing of Mr. and Mrs. Hume, so that the master's deed was, in substance and effect, the deed of Mr. and Mrs. Hume, and when we have the additional fact that they received their share of the consideration money, it seems to me quite plain that they are estopped, on plain principles of justice, from setting up that the conveyance did not pass their interest in the land.

For these reasons, expressed orally at the hearing, I shall advise that Mrs. Hume and her children have no interest in the premises.

We come, now, to the complainant's case, as made by the bill, answers and proofs, as against Mr. Bouvier.

The proof shows, and it was admitted, that immediately after the rendition of the final judgment in ejectment complainant attempted, without success, to settle with Mr. Bouvier.

But if he had agreed with Mr. Bouvier as to the price to be paid for the strip in question, he was still embarrassed by the express declaration of the court of errors and appeals, above referred to, that an equal and undivided one-half part of the title still rested in the heirs-at-law and devisees of Mr. Hume. Mrs. Hume seemed to be the universal devisee of her husband, who had in the meantime died.

But, then, it further appeared that there were children who were born after the making of Mr. Hume's will, and their conveyances to their mother were, as I now recollect, not yet on record.

Bouvier did not admit any title outside of himself.

Under these circumstances the complainant had a clear equity

to apply to this court for relief—*first,* to ascertain who were the real owners of the strip; and *second,* as I think and am well assured, to ask this court to determine how much it ought to pay those owners when ascertained. This latter equity will be elaborated further on.

It is proper for me here to say that when counsel for complainant first applied to me for an *interim* injunction against the execution of defendant's judgment in ejectment, he desired me to proceed upon the basis of the practice adopted in *Trenton Water Power Co.* v. *Chambers,* 9 *N. J. Eq.* (*1 Stock.*) *471,* but I declined so to do, and declared that I would only grant an injunction upon condition that complainant would take immediate proceedings for condemnation, stating orally at the time that I would so manage it that the commissioners and jury, on appeal, should appraise the value and damages in such manner that this court would be informed of the value and damages both with and without the improvements placed upon the premises by the railroad. This course was pursued.

The defendant Bouvier answered the original bill, denying that complainant had any standing in this court for any purpose, and denying that it had any right to take the condemnation proceedings mentioned in its bill, and added to his answer a cross-bill praying that complainant be enjoined from so doing.

He shortly thereafter removed the condemnation proceedings by *certiorari* to the supreme court, and there challenged their validity, and was defeated, as reported in *69 N. J. Law* (*40 Vr.*) *149.*

Promptly after this decision complainant applied for, on notice, and obtained leave to amend its bill both in its statement and its prayer, in substance as follows:

In the stating part—that if proceedings for condemnation were taken the inquiry before the commissioners will be limited to an appraisement of the land and an assessment of the value thereof at the time of the condemnation and damages sustained by the owner on the same basis, and that neither the commissioners nor the jury, on appeal, have power to inquire into the circumstances of the case, nor consider the equities set forth in the bill. Then alleging the fact that valuable improvements

have been made by the complainant since its entry on the premises prior to 1890 under the deed from Reichard and Hume, and that a railroad has been built thereon, part of a greater line, and that an appraisement which should include the value of the railroad tracks would not be a measure of the fair compensation to the owner of the land, and would work great injustice to the complainant, and that the compensation which should fairly be made to the defendant could only be ascertained by this court or under its direction, and in view of the facts hereinbefore set forth.

And a further amendment in the prayer that this court may retain the bill and may proceed in such manner as it may see fit to ascertain what is the fair and full compensation that should be made by the complainant, under all the circumstances of the case, to the defendant for the taking of the lands and the damages sustained by reason thereof, the complainant tendering itself ready and willing to pay the amount so ascertained; and further, that if this court should see fit to direct that the proceedings for condemnation should be continued, that then an order may be made that the commissioners, and jury in case of appeal, should appraise and estimate the value of the land taken, apart from the structure and work and materials placed and done thereon, and without regard to the tracks and cuttings and embankments laid and made thereon, and without regard to the use made by the complainant of the railroad built thereon.

No answer was filed to this amendment.

Coincident with the amendment of the bill by the complainant, the defendant Bouvier applied for and obtained leave to withdraw so much of his answer as was a cross-bill, and the complainant's answer thereto was also withdrawn, and then, on motion of the complainant, and without objection by the defendant Bouvier, a special order was made, as follows:

It recites that it appears to the court that commissioners have been appointed to condemn the land in question, and the complainant asks it to make provision for ascertaining the value of the lands proposed to be taken for railroad purposes apart from the railroad and structures already made and built thereon by the complainant, and that an order may be made to assure

a special assessment by the commissioners, and by the jury in case of appeal, of the value of the land as if it had never been used for railroad purposes, and no embankments, cuts or structures had been built or made thereon; such assessment to be in addition to and independent of such assessment as may be or shall be made under the order made by the judge or court appointing said commissioners, and proceeds:

"It is ordered that the defendant shall consent at the hearing before the commissioners in the proceedings for condemnation and before the jury, on appeal, for the purposes of such proceedings and of this cause, and for no other purpose, that the commissioners and the jury, respectively, when making an appraisement and assessment in such proceedings, and in addition to the appraisement and assessment so made by them, shall make a special appraisement of the value of the land to be condemned as if it had never been used for railroad purposes, without regard to the railroad track, structures, trestles, embankments, cuttings, additions and changes made or built thereon by the complainant, or to the use made of the lands and structures by the complainant as a part of its railroad."

Under these circumstances, I think that simple justice to the complainant requires that the case should be considered in all respects as if the amendments to its original bill just referred to had been inserted in the bill at the time it was filed, and the condemnation proceedings should be treated as having been taken by the direction of this court as a convenient mode of ascertaining values, to be used by this court in working out and administering the equities between the parties.

The result of those proceedings was the two findings by the jury above mentioned.

After the rendition of these verdicts a motion was made in the law court for a new trial, and refused.

The complainant then filed a supplemental bill, setting up the proceedings in the law court, praying for relief against a judgment being entered on either of the verdicts, charging that they were unjust and excessive and based upon wrong principles, and asked this court to disregard both verdicts and to ascertain for itself, in such manner as it might see fit, what amount the complainant ought to pay.

In his answer to this supplemental bill the defendant merely

echoed his previous answer and denied that the complainant had any equity whatever, setting up that the complainant had deliberately taken his choice to proceed at law, without application to this court, and is bound by his selection, and stating as a reason why there is no injustice to the complainant in holding it to the larger verdict that the complainant forfeited its title to said land by its own voluntary act and breach of the conditions in its deed.

In this condition of the pleadings the cause was brought to a hearing.

I declined to hear any evidence to show that either of the verdicts was excessive unless complainant would satisfy me in argument that it would be just and equitable for me to do so.

This he has not been able to do, especially in view of the admitted fact that a motion was made and heard by the learned judge who presided at the trial to set aside the verdicts because excessive.

It would be manifestly unjust to permit the complainant to speculate in that manner on the result of an appeal which it had taken itself. Equity will not permit it to find fault with the result of an appeal which it has itself taken and which it was under no obligations to take.

If the complainant had rested content with the award of the commissioners, and the defendant had appealed therefrom, with the result which actually occurred, it is quite possible that this court might, under the view which I take of this case, have determined that it would ignore the verdict of the jury and adopt the award of the commission.

I feel constrained, however, to say that the great difference in the damages to adjoining property found by the commissioners and those found by the jury—about seven times as much —leads to the suspicion that the jury did take into consideration improper matter in the fixing of the damages.

Two questions remain.

*First.* Shall this court adopt and compel the complainant to pay to Mr. Bouvier the whole value of the strip of land taken, which includes, confessedly, the value of its railroad embankments, cuts and tracks, or shall it limit Mr. Bouvier's right to

the value of the land without the railroad improvements, as found by the smaller verdict?

*Second.* Is Mr. Bouvier entitled, under the circumstances, to any damages to his adjoining land?

As the result of the actual partition of the premises, as shown on the map forming part of the master's report in partition, Mr. Hume became the owner of certain tracts adjoining the railroad, on one side, and Mr. Bouvier's immediate grantors, and Mr. Bouvier, in succession to them, became entitled to certain lands adjoining the railroad on the other side, and by reason of his ownership of these lands, which were a part of the original tract, damages were awarded to him to the extent of $3,600, and to the Humes, on the basis of their being the owners of an undivided one-half interest, damages were awarded to the extent of $3,780—in all over $7,380—while the value of the land itself, without the railroad structures, was put at $2,716.50. But as the Humes' interest is eliminated, they are not, of course, entitled to any damages to their adjoining lands, hence the amount to be paid by complainant, if the value of the improvements is excluded, is $6,316.50.

The quantity of land originally conveyed by Bouvier's grantors to complainant was five and fifty-two hundredths acres, consisting of a strip one hundred feet wide and about two thousand two hundred feet, or a little over one-third of a mile, in length, with an addition at one end of fifty-one hundredths acres, outside of the one-hundred-foot strip, which was intended for a railroad station.

The strip conveyed and here in question omits the railroad station and includes only four and ninety-one hundredths acres.

It may be well to observe just here that at no stage of the proceedings did counsel on either side suggest to the court that the commissioners should be instructed to ascertain the value of the land and incidental damages as of the date of the original entry by the railway, with the view of adopting that value, with interest from the date thereof, as a proper method of compensation. Manifestly, that rule was inapplicable.

Coming, now, to the first question. A long line of cases in this court and one in the supreme court of this state, and

numerous others in other states of the union, collected and cited by counsel for the complainant, hold, with entire unanimity, that except where the railroad company entered in the first place as a willful trespasser, or where it has been guilty of some inequitable conduct sufficient to raise a counter equity, the value of the land without the additions and superstructures is the proper measure of compensation in a case like the present.

Such was the expressed declaration, after full consideration, of our court of errors and appeals, in *North Hudson County Railroad Co.* v. *Booraem,* 28 *N. J. Eq.* (*1 Stew.*) 450.

The foundation of the rule in equity is its intrinsic justice. This appears from an examination of the cases cited.

Justice Depue, in the *Booraem Case, supra* (at *p. 455*), says: "But where the company has taken possession by the consent of the owner, and has expended money in the adaptation of the land to the proposed use, and altered and changed its condition, this rule (referring to the fixed rule at law) manifestly is not adapted to reach the just compensation contemplated by the constitutional provision." Then, after showing that it might be unjust to the landowner to compel him to take the value of the land at the time of the appraisement, because it might have been injured in value by reason of the change made by the railroad company, he proceeds: "On the other hand, to compel the corporation to pay, as the value of the land, an increased price because of the improvements made by it, would be unjust to it. The owner has no claim in justice to have expenditures for such purposes enure to his benefit. Under such circumstances he is entitled to be paid the damages he has sustained, and nothing more. That will be represented by the value of the land as it was before it was changed in its condition, irrespective of the structure put upon it by the corporation, and interest from that time. Neither in law nor in equity is the owner entitled to anything more."

The learned judge then proceeds to cite cases in support of that proposition.

This rule had been previously applied in the case of *Trenton Water Co.* v. *Chambers, 9 N. J. Eq.* (*1 Stock.*) 471; *S. C.*, 13 *N. J. Eq.* (*2 Beas.*) 199.

Confessedly, the same rule was adopted at law in *Coster* v. *New Jersey Railroad and Transportation Co.,* 23 *N. J. Law* (*3 Zab.*) 227, and 24 *N. J. Law* (*4 Zab.*) 730. And it was only by what was held by the law court to be the stress of the statute regulating condemnation proceedings that any other rule was adopted at law, for in *Leeds* v. *Camden and Atlantic Railroad Co.,* 53 *N. J. Law* (*24 Vr.*) 229, the learned judge, who spoke for the court of errors and appeals, closed his opinion as follows: "The equitable rule, which appears to have been followed in the present case, is that when prepayment has been waived the landowner retains an equitable lien upon the land for the payment of such damages as he has sustained, when the company violates the conditions upon which the entry without compensation was permitted, which may be enforced in a court of equity. *Wood Railw. L.* 785.

"The value of the land and damages at the time the entry was made, and interest from that time, have been fixed as a proper measure of damages in some such cases. See *North Hudson County Railroad Co.* v. *Booraem,* 28 *N. J. Eq.* (*1 Stew.*) 450, and later cases that have followed it.

"When parties are before that court seeking the adjustment of equitable claims for and against the railroad company, all the rights of the landowner will be protected, and full compensation may be made, not only for the value of the land taken and the damages incident to the taking, but also for the breach of any agreement made with him, and allowance for the occupancy of the land under such agreement or by consent or license. When the company proceeds to condemn lands, under its charter, it can act only according to the exact terms of the power therein conferred. There was error in the ruling and the judgment will be reversed."

The question in *Leeds* v. *Camden and Atlantic Railroad Co., supra,* was whether the land should be appraised as of the date when taken or as of the date of the appraisement, and it was held that the statute required it to be taken as of the date of the appraisement.

A careful reading of the opinion does not lead me to the conclusion that the court intended to decide that the value of the railroad structure should be added to the value of the land.

However that may be, in the case which followed it in the supreme court, namely, *Trimmer* v. *Pennsylvania, Poughkeepsie and Boston Railroad Co., 55 N. J. Law (26 Vr.) 46,* the learned judge who spoke for the supreme court seems to have so treated it, and states that there is an apparent inconsistency between the *Leeds Case* and the *Booraem Case,* and reconciles them as follows: "The difference, however, arises from a distinction taken in the later case between a proceeding to condemn, considered as a purely legal proceeding, and a proceeding in an equitable suit to ascertain the damages which the landowner has sustained by reason of the appropriation of his land. In equity, when a corporation having power to condemn has been let into possession by the landowner and makes improvements, the court will adjust the claims of the landowner upon the basis laid down in the *Booraem Case.* The court will, by means of a reference to a master, ascertain the damages to the landowner according to this standard of compensation. In the *Booraem Case* the award of the commissioners, although made upon an erroneous legal principle, was in conformity with the equitable rule, and so was permitted to stand in place of a report of a master to whom a reference might have been made. If the question of compensation had not been drawn into a court of equity by the foreclosure of a mortgage covering the land condemned in addition to other land, the rule adopted by the commissioners in that case would have been inaccurate.

"The result of these conflicting rules seems to be that if a corporation, under the conditions mentioned, takes proceedings to condemn lands, the legal rule applies; but if the question of the value of the land becomes involved in a suit in equity, the equitable rule applies. So if, under these conditions, the owner brings an action of ejectment to dispossess the company, a court of equity will stay the action upon payment of damages to be ascertained in conformity with the equitable rule. *Trenton Water Co.* v. *Chambers, 9 N. J. Eq. (1 Stock.) 471; S. C., 13 N. J. Eq. (2 Beas.) 199.*"

(The question, after all, was not involved in the *Trimmer Case,* since the case disclosed no privity, by way of succession or otherwise, between the railroad company prosecuting the pro-

ceedings before the court and that which had built the works upon the ground included in the condemnation proceedings.)

The only case which has been cited by the defendant in conflict with the *Booraem Case* and the other cases in the same line is *Briggs* v. *Chicago, K. & W. R. R. Co., 56 Kan. 526; 43 Pac. Rep. 1131,* decided by the supreme court of Kansas, March 7th, 1896. The case is much like the *Booraem Case,* and, as in that case, on condemnation proceedings, the inferior tribunal held that the value of the land, without the additions made by the railroad company, was the true measure of compensation. But the supreme court, on appeal, held otherwise, and made the railroad pay the purchaser under foreclosure the full value. The injustice of it was felt by the supreme court, but it seems to have felt constrained to do the injustice. I prefer the rule laid down by our court of errors and appeals in the *Booraem Case,* and am glad to feel bound to follow it.

Now, the quality of justice or injustice in a given transaction does not depend upon or vary with the name or character of the court under whose jurisdiction it is brought for consideration. What is considered unjust in a court of equity is also considered unjust in a court of law, and so says Justice Depue in the *Booraem Case.* It is felt to be quite as unjust by a common law judge for a trustee of the legal title to eject the *cestui que trust* and hold the subject of the trust against him as it was by the equity judge.

The difference, and the only difference, between the two courts lies in the variance in their several capacities to protect the rights of the *cestui que trust.* It is a mere matter of judicial machinery. The learned judges in the *Leeds Case* and the *Trimmer Case,* from whose opinions extracts have been recited, did not mean to say, and in fact did not say, that it was just that improvements already put upon the property by the railroad company should be included in making up the valuation and price to be paid by that company on condemnation proceedings, but only that the statute is so framed that it must be done.

Aristotle (*5 Aris. Ethics ch. 10*) defines equity as "a better sort of justice which corrects legal justice where the latter errs

through being expressed in a universal form, and not taking account of particular cases." And Grotius condensed this definition into the modern one, namely, "Equity is the correction of the law wherein by reason of its universality it is deficient."

It seems to me that the present case is brought directly and clearly within the definition of these great men, and the propriety and the duty of this court to exercise its corrective power abundantly appears and of itself gives this court jurisdiction to act.

The complainant herein, then, by all the authorities, is properly in this court, and is entitled to have the equitable rules applied precisely as in the *Booraem Case,* unless there are some circumstances in the case to bar its equity.

Moreover, its right to ask the aid of the court arises not only out of the injustice of being compelled to pay the defendant for improvements which it has, at its own expense, put upon the premises, but it has a distinct standing in the court by reason of the character of the defendant's title, which rests upon a forfeiture by reason of complainant's failure to perform a condition subsequent. The right of re-entry for such failure was manifestly reserved in the deed for the purpose of insuring the performance of those conditions. Hence the case assumes the aspect of a mortgage given to secure the performance of those conditions, and must be so treated for present purposes.

Let us examine its position.

In the first place, at the time it took the conveyance from the former owners, it was duly empowered to acquire the lands by ordinary condemnation proceedings.

But it agreed with the owners and bought the land, and paid for it the sum of $1,199, upwards of $200 per acre. Thus its original entry was entirely lawful. Nothing that it subsequently did or failed to do can alter that position. The right of re-entry in the grantors, found and established by the court, not only does not make that original entry unlawful, but recognizes its lawfulness.

This price of $1,199 was not, however, the whole consideration for the conveyance. The grantors seem to have expected some

benefit to their remaining land to arise from the construction of the proposed railway. Hence the insertion of the conditions —*first,* that a railway passenger station should be erected on part of the land conveyed, and maintained; and *second,* that a double-track railway should be constructed and maintained over it.

It will be observed that there is no such provision here as was found in the case of *New York and Greenwood Lake Railroad Co.* v. *Stanley, 34 N. J. Eq.* (*7 Stew.*) *55,* where the provision was for the running and stopping of four trains daily each way.

There was no provision here that any train should be run over the railway or should stop at the station. If the railway had been double-tracked all the way across the land conveyed— for that is the language—and nowhere else on the line of the railroad, and a passenger railway station had been erected and maintained, and no train had ever run over the road, and no passenger train ever stopped at the station, I am unable to see how any court could have declared that the land was forfeited and a right of re-entry had accrued.

Be that as it may, the conditions were not fulfilled. The double track was laid two-thirds of the way across the strip, but the passenger station was never erected.

In fact, it was admitted that the road was built and intended for the purpose of carrying freight only, and not passengers, and that it never has made it a business of carrying passengers, so that the passenger station would have proved, if built, of no value whatever to the landowners.

Let us now ask what were the actual conditions when this land was conveyed, and what reasonable expectation the land-owners had of any appreciable benefit to them.

The road in its total length is and was less than six miles, and its general course was and is northwest and southeast, which is directly athwart the general course of passenger travel in that portion of New Jersey. Its termini were a point at or near Cranford, on the Central Railroad of New Jersey and Staten Island sound, across which it was to be carried by a bridge to Staten Island.

The grantors are chargeable with knowledge of all this. Manifestly, it was not intended to be used as a passenger road. The land here in question lies between the New Jersey Central or the Lehigh Valley railroad, at or near Cranford, and the Pennsylvania railroad, at the familiar point where the complainant's road crosses the latter road.

Manifestly the only chance the complainant's road had of making a business of carrying passengers was to make some sort of a passenger traffic arrangement with either the Central Railroad of New Jersey or the Lehigh Valley railroad, at or near Cranford, or with the Long Branch railroad on the sound, and manifestly and confessedly there was no population, present or prospective, along the complainant's road between the Pennsylvania railroad and the Lehigh Valley railroad which would warrant the establishment of a set of passenger trains to be run over it and to reach New York by either of those railroad lines.

These considerations lead me to the conclusion that complainant's grantors had no reasonable grounds to expect any appreciable benefit from the construction and operation of the road.

With regard to the condition of building a double-track road. Its terms would have been fully and literally complied with, as before remarked, by laying a double track across the strip conveyed.

But suppose the implication was that it was to be double-tracked throughout its length of five and one-half miles, of what material benefit would such construction be to the grantors' land? I confess I am unable to see any, unless, indeed, it could be conceived that it was to become a great through route for passengers.

But this supposition seems to me quite extravagant and inadmissible.

A common experience teaches us that the greater number of trains that pass over a railroad the greater injury it is to the adjoining lands, though, on the other hand, the greater the number of passenger trains the greater the probability of benefit.

No evidence was offered before me to show what, if any, benefits were expected to be derived or could be derived by the fulfillment of the two conditions in question. The case was

submitted on the bare right arising out of the non-performance of the conditions.

Now, I deem this aspect of the case important, since Bouvier's right arises out of a forfeiture by the complainant of its land, for which it had once paid, by reason of the non-fulfillment of certain subsequent conditions.

Now, it is one of the offices of the court of chancery to relieve against forfeitures, and it does so gladly, but always upon equitable terms. And those terms are to make compensation to the party claiming the forfeiture for his real loss or injury.

In the present case the complainant has lost the sum of $1,199, with the interest on it for all these years, and I am unable to see, on that part of the case, why it ought to lose any more.

No allegation of injury or loss is found in the defendant's answer and no proof of any was offered by him. This, it seems to me, it was the privilege of the defendant to do. One of the reasons given by the learned judge in the *Leeds Case* for determining cases of this kind in this court is that "allowance can here be made for the breach of any agreement made by the railroad company with the landowner."

Let us next inquire if there has been anything inequitable in complainant's conduct since the proceedings to recover the land were commenced.

I think it was entirely justified in defending the case at law and saving the forfeiture, if it could do so. The questions raised were real and not colorable merely, and were such as were fairly debatable.

Upon the whole, then, I see no such conduct on the part of the complainant that may be deemed inequitable to such an extent or degree as to bar it from the right to be dealt with as a deserving suitor in this court, and to have relief as such in accordance with the principles applicable to such cases.

These positions were not seriously contested by counsel for Bouvier, as I understand his oral argument.

I understood him to place himself on the ground that all these equitable considerations are barred by the action and judgment of ejectment; that the relations between the railroad

company and the original grantors and himself, as their successor, is entirely changed by the judgment in ejectment, and that that judgment gives Bouvier a new, independent, solidified and crystallized title, which in some mysterious way bars the exercise—or rather the application—of any equitable principles.

I am unable to take that view or to see the least force in the argument presented in its support.

A proceeding in ejectment is simply one to obtain possession of land. In order to succeed the plaintiff therein must show that at the time he commenced his suit he was entitled to such possession. He need show no more. Nothing else is put in issue. The character or extent of the title, whether in fee or in pledge, or for a term of years or for a single year, is not put in issue, nor determined by the court, if it be in the plaintiff's favor.

Nor is the character or quality of the right, whatever it may be, upon which the plaintiff recovered, in the least degree affected, increased or strengthened by a judgment in his favor. He obtains no new title, nor anything in the nature of a new title, but simply a declaration of the court to the effect that by virtue of the right which he had at the commencement of the suit he is entitled to take possession.

This appears clearly from the judgment record in this case.

The section of the statute relied on by counsel for the defendant is as follows:

"44. A judgment in an action of ejectment shall be conclusive as to the right of possession and the title to the premises (as the case may be), as the same has been established by such judgment."

The declaration of the plaintiff in ejectment herein declares that the plaintiff, Bouvier, "demands of the Baltimore and New York Railroad Company, the defendants therein, *the possession of all that land,*" &c.

And the judgment is:

"Therefore, it is considered that the said plaintiff do recover against the said defendant *his term yet to come* of and in the tenements aforesaid, with the appurtenances,   *   *   *   and thereupon the said plaintiff prays the writ of the State of New Jersey, directed to the sheriff of the county of Union aforesaid, to cause him to *have possession of his said term yet to come,*" &c.

Clearly, then, we must look beyond the record for the real character of defendant's title. And when we do so, we find that it rests on a forfeiture, and all that is conclusively settled by the judgment in ejectment is that the forfeiture has actually taken place, with all its legal consequences.

But, argues the counsel for the defendant in his written argument, the effect of the judgment in ejectment, if it be limited in its effect to showing that the defendant herein was the party who was entitled to possession at the time of the commencement of his suit, is nevertheless to show that at that time the entire estate of the complainant in the premises was gone forever, and it stood without a shred of right at law to retain possession. "Its estate under the deed was entirely gone, and by its own consent Bouvier, the defendant herein, became possessed as of the former estate of Reichard and Hume, and was not entitled by virtue of its former estate, either legally or equitably, for any allowance on account of improvements put thereupon."

Granting that may be so in a court of law, it is to be remarked that the same is true of a common law mortgage after ejectment brought and recovered upon it, or of an absolute deed given to secure a sum of money.

But the question here is whether that hard and fast rule of the common law applies to a court of equity.

I think not. I am unable to see why it should, any more than in any other case of forfeiture of an estate by breach of a condition subsequent.

The effect of the judgment of ejectment, based on a mortgage or an ordinary deed of conveyance by way of mortgage, is simply to establish at law the right of the plaintiff in ejectment, and does not affect the equity of redemption. No case was cited by counsel to sustain his position in that behalf. And the same principle applies in the case of the loss of the legal title by breach of a condition subsequent. If the defendant has an equitable defence, it is undisturbed by the judgment in ejectment.

The principle contended for by defendant would prevent this court from relieving against the loss of an estate by breach of

a condition subsequent, no matter how unimportant the condition or how trifling the injury actually resulting therefrom.

This doctrine is enlarged upon by Mr. Justice Story (section 1316), as follows:

"In reason, in conscience, in natural equity, there is no ground to say, because a man has stipulated for a penalty, in case of his omission to do a particular act (the real object of the parties being the performance of the act), that if he omits to do the act he shall suffer an enormous loss, wholly disproportionate to the injury to the other party. If it be said that it is his own folly to have made such a stipulation, it may equally well be said that the folly of one man cannot authorize gross oppression on the other side."

At section 1314, speaking of penalties, he says:

"If it is to secure the performance of some collateral act or undertaking, then courts of equity will retain the bill, and will direct an issue of *quantum damnificatus;* and, when the amount of damages is ascertained by a jury, upon the trial of such an issue, they will grant relief upon payment of such damages."

And, in section 1315, he says:

"And, in cases of this sort, admitting of compensation, there is rarely any distinction allowed in courts of equity between conditions precedent and conditions subsequent, for it has been truly said that although the distinction between conditions precedent and conditions subsequent is known and often mentioned in courts of equity, yet the prevailing, though not the universal, distinction as to condition there is between cases *where compensation can be made* and cases where it cannot be made, without any regard to the fact, whether they are conditions precedent or conditions subsequent."

Professor Pomeroy, in his treatise on *Equity Jurisprudence* (section 381), says:

"The general doctrine was finally settled that, wherever a penalty or forfeiture is inserted merely to secure the payment of money, or the performance of some act, or the enjoyment of some right or benefit, equity regards such payment, performance or enjoyment as the real and principal intent of the instrument, and the penalty or forfeiture as merely an accessory, and will therefore relieve the debtor party from such penalty or forfeiture, whenever the actual damages sustained by the creditor party can be adequately compensated. The application of the principle in such cases, and the relief against penalties or forfeitures, must always

depend upon the question whether compensation can or cannot be made. If the principal contract is merely for the payment of money, there can be no difficulty; the debtor party will always be relieved from the penalty or forfeiture upon paying the amount due, and interest. If the principal contract is for the performance of some other act or undertaking, and its non-performance can be pecuniarily compensated, the amount of such damages will be ascertained and the debtor will be relieved upon their payment. But the principle, in this scope of its operation, is not confined to agreements; it has been extended so as to prevent the forfeiture of a tenant's estate under a clause of re-entry for the non-payment of rent, or for the breach of some, though not of all, the covenants contained in a lease, and to prevent the enforcement of a forfeiture for the non-performance of conditions subsequent."

And, in section 433, he says:

"Where the penalty is to secure the performance of some collateral act or undertaking equity will interpose, if adequate compensation can be made to the creditor party. The original practice in such cases was for the court of equity to retain the bill, direct an issue to ascertain the amount of damages and to grant relief upon payment of the damages thus assessed by the jury. By the more modern practice, the court of equity would doubtless determine the amount of damages itself, without the intervention of a jury."

This doctrine depends upon the intrinsic equity of the affair, and not, as contended for by counsel for defendant, upon the other general heads of equity jurisprudence—fraud, accident, mistake, surprise and the like. Thus we have Professor Pomeroy (in section 451) distinctly stating as follows:

"Although the agreement is not one measurable by a pecuniary compensation, still, if the party bound by it has been prevented from an exact fulfillment, so that a forfeiture is incurred, by unavoidable accident, by fraud, by surprise or by ignorance, not willful, a court of equity will interpose and relieve him from the forfeiture so caused"

upon equitable terms. And he further holds (section 452), in effect, that even where the fault is without what may be termed equitable excuse, relief may be granted. And it is proper here to remark that the negligence or willful default of the debtor in the payment of the amount secured by an ordinary money bond will not debar the debtor from relief from payment of the amount actually due.

And Mr. Justice Scudder, speaking for the court of errors and appeals, in *Grigg* v. *Landis, 21 N. J. Eq. (6 C. E. Gr.) 494* (at *p. 501*), uses this significant language: "Penalties, forfeitures and re-entries for conditions broken are not favored in equity, and constitute a large branch of equitable relief. Usually they are held to be securities for the payment of money and the performance of conditions, and where compensation can be made for non-payment and non-performance, equity will relieve against the rigid enforcement of the contract. This is upon the general principle that a court of equity is a court of conscience and will permit nothing to be done within its jurisdiction which is unconscionable."

The court was there dealing with the case of specific performance of a contract to convey land and the complainant was met by a clause of forfeiture in the contract.

But, says the defendant, there is a class of cases where the damages are so uncertain and so difficult of ascertainment with precision that the court will not undertake to relieve against a forfeiture, and he contends that this is one of those cases, and he ranges it with that class of cases arising out of ordinary contracts where the parties have agreed upon a fixed sum of money as liquidated damages in case of breach, and which the courts find to be liquidated damages because the actual damages are so difficult of ascertainment as to render liquidated damages conscionable.

But even in those cases, where the damages fixed and declared to be liquidated so far exceed any injury that the court can conceive that it is either probable or possible that the party can have sustained, the courts avoid, if possible, the enforcement of the contract.

Now, let us see how this case stands in that respect. But just here, and before proceeding to consider that precise question, it is proper to remark that counsel for complainant addressed a strong argument to me in favor of his position that by the true construction of the contract it was not within the contemplation of the parties that anything more than the land, without the railroad structure, should revert in case of the breach of the condition subsequent. Without expressing any

opinion on that argument, I refer to what I have already said with regard to the circumstance that the location and length of the railroad was such as to preclude the idea that its establishment and operation could be of much value by way of benefit to the adjoining property, and it does seem to me that the forfeiture of $13,000 or $14,000 worth of property, for the failure upon the strength of which this ejectment was recovered, shocks the conscience and sense of justice of a chancellor.

But, after all, are the damages resulting from the non-fulfillment of those conditions incapable of measurement?

It is urged by the defendant, and it is conceded, that the $1,199 paid was not the full consideration (though the use of odd dollars indicates that there was some price by the acre), and that the landowners expected to derive a substantial benefit from the construction of the road and the establishment of a passenger station on their lands, and (although not expressed in the deed) from the operation of the railroad as a passenger carrier and the stopping of the trains at that station.

Now, the question is how much of the actual value of the land conveyed and the incidental damages to the remaining land was abated or allowed to the railroad company in fixing the price for the land conveyed. Now, that is the sort of question which is constantly being dealt with and determined according to a familiar rule, and that rule is the comparative value of the land with and without the advantages of the railway station and passenger trains stopping thereat. That I understand to be the way the question would be put to a jury.

It would be so put to the jury for the purpose of ascertaining the incidental damages to the adjoining lands due to the devotion of the same to railroad purposes. The jury would be directed to ascertain how much less the adjoining lands were worth in the market by reason of the construction and operation of the railroad. And that without regard to the general benefits of all the land in the neighborhood to be derived from such construction and operation.

Now, let us inquire what has been awarded to the defendant herein. He has been awarded the full value of the land originally bought and paid for, as it was at the commencement of

the condemnation proceedings, precisely as if no railroad structure had ever been placed upon it, and he has been awarded $3,600 as incidental damages to his adjoining land. Now, the presumption is that the jury awarded those damages on the basis which I have stated, namely, as the amount which the other lands of the defendant will be depreciated in market value by the existence of the railroad and its operation. Here, then, it seems to me, we have ascertained by the jury the precise damages which the defendant has or can ever sustain by the failure of the complainant to fulfill its contract. For it must be remembered that it was within the power of the complainant, in the first place, to have acquired these lands by condemnation proceedings, on precisely the same basis as it has now acquired them, and it is not to be presumed that the amount abated from the value of the land and damages at the date of the original purchase was more than the amount which would have been awarded in ordinary condemnation proceedings. Now, the defendant will get back all of that, and I have not the least doubt that he will get a great deal more, and I find it impossible to conceive that his land would have been increased in value by the fulfillment of those conditions in the deed by anything like the amount so awarded him.

Shortly stated, I think it is impossible to suppose that the damages suffered by the non-fulfillment of the conditions in the deed are greater than the whole value of the land so taken, with the incidental damages to the adjoining land.

But this discussion is academic. In the shape which the case has taken, the only forfeiture from which the complainant is asking relief is the value of the superstructure and work put upon the land in question, and that has been ascertained by the jury and is represented by the difference in the amount of the two awards, namely, $13,212.50 and $2,716.50. It will be observed that no damages to adjoining property were included in the greater verdict. This was explained by counsel for defendant at the argument by his statement that at the trial before the jury he had explicitly waived any damages to adjoining property on the appraisement of the premises in question with the additions.

But, says the defendant, the petitioner is not entitled to any relief at the hands of this court, because it deliberately broke its covenant, and therein the case differs from those where, by reason of some equitable circumstance, such as oversight of its duty, or pecuniary or physical inability, or other exculpatory circumstances, a party has failed in that regard.

Against that it is to be observed that there is no proof in this case that the complainant ever had its attention called by the defendant to the existence of this covenant, prior to the commencement of the ejectment, or was requested, and refused, to build the station and complete the double track across the lot.

One can imagine that the complainant and its officers had entirely overlooked these conditions found in its deed, and forgotten, if they ever knew, of their existence.

But, taking the case as it stands, it is fair to presume that the complainant's officers, knowing that the road was built as a freight road, and not a passenger carrier, and that its assumption of that function would, under the circumstances, be of no appreciable benefit to the defendant, and knowing that it had the right by law to take condemnation proceedings to re-acquire the land in case the forfeiture was enforced against it, and, relying upon the just and equitable rule for ascertaining the value and damages on such proceedings, deliberately concluded not to fulfill those conditions.

I am unable to see how that conclusion and subsequent action founded thereon deprives it of its standing in this court, since, for reasons previously stated, I am unable to perceive how the establishment of a passenger station and the building of a double track would benefit the defendant's land in any appreciable degree.

The case of *Bracebridge* v. *Buckley,* in the exchequer chamber, reported in *2 Price 200,* cited by defendant, was decided by a divided court, and does not sustain the position claimed by the defendant—that relief in these cases is never granted where the forfeiture results from complainant's neglect or willful act, or otherwise than from fraud, accident, surprise or mistake.

It was put distinctly on the ground of the inability of the

court to ascertain the damages, and it did not appear that the forfeiture was of any serious injury to the complainant, and the real ground was the peculiar relation between landlord and tenant.

Chancellor Kent, in *Livingston* v. *Tompkins, 4 Johns. Ch. 433,* in a casual remark relied upon by the defendant, gives an unwarranted force to that case. In fact, the case is cited, among others, by Professor Pomeroy, as authority for the position that the court will relieve where the damages can be ascertained.

The canon, as claimed by the defendant, would exclude relief where there was a failure through inability to pay a sum of money. On the contrary, the authorities show, as before remarked, that the failure, without excuse, to perform the conditions subsequent, does not necessarily affect the defaulter's right to relief.

I have examined the cases collected in the notes to *Peachy* v. *Duke of Somerset, 2 Lead. Cas. Eq. 2014,* in which the English courts have held that the injury resulting from a breach of conditions subsequent was not measurable in damages, and have found them to be mainly conditions in leases that the tenant should not assign the lease, should keep the premises insured and in repair.

With regard to the provision for keeping the premises in repair, it was at first held that the damages to result therefrom could be measured, and relief would be granted the tenant, upon the terms of making the repairs, but later on this view was overruled.

All these instances are those of the failure to observe a line of continuing policy affecting the relation of landlord and tenant. Take the case of failure to insure. It meant simply that the landlord was unwilling to have a tenant of such business habits as that the buildings should not be protected by insurance. For it must be remembered that though the landlord might protect himself by insurance on the payment of premiums, yet that required care and watchfulness on his part, and a certain condition and use of the premises in order to enable him to insure on any terms.

So with regard to the covenant not to assign without the consent of the landlord. The latter had the right to stipulate against occupying the relation of landlord and tenant with any person not agreeable to himself.

The same consideration applies to the case of allowing the premises to fall into a state of disrepair, or committing actual waste. The landlord had a right to stipulate that he declined to have such a tenant.

No one can read the cases on this subject in the English courts in which a breach of conditions subsequent has been held unrelievable in equity, and which are confined almost exclusively to cases of landlord and tenant, without feeling that the hard and fast rule finally adopted and enforced by the English courts of equity led to great hardships—so great, indeed, that I believe parliament finally felt constrained to interfere. Be that as it may, those cases have no application here.

Somewhat on the same principle, the court of errors and appeals in this state held that failure to fulfill breaches of the conditions precedent in the contract under consideration, in *Grigg* v. *Landis, 21 N. J. Eq. (6 C. E. Gr.) 494,* could not be relieved against on the ordinary principles of making compensation for damages resulting from their breach and unenforcement. The court found that Mr. Landis inserted these conditions in his contracts for sale for the purpose of enforcing the peculiar scheme which he had formed for building up a town, and that they must be performed as far as reasonable. But they relieved Mr. Grigg on the ground of the equities arising out of the acquiescence of Mr. Landis in the breaches.

It would have been quite impossible in that case, as in the cases before referred to between landlord and tenant, to show that any damages whatever had been sustained by Mr. Landis by reason of the breaches or non-performance of the conditions precedent in the contract to convey.

But it was argued by counsel for defendant, in his written argument, that the right to relief against a forfeiture was not set up in the bill, nor was it framed on any such theory.

I am unable to yield to that argument. The bill, as amended,

which was done before any proceedings had taken place before the commissioners, must be treated as if the amendments had been incorporated in the bill when first filed, and the bill, as amended, clearly shows that the complainant was seeking to have the amount to be paid ascertained upon the basis, at the outside, of the actual value of the land, without the improvements, and this necessarily included the notion that the improvements ought not to be forfeited.

The defendant therefore had notice, not only by the bill as amended, but by the special order which was made directing two awards and two verdicts of what was the precise question intended to be raised. Moreover, he was well aware of the line of decisions on this subject, found in the cases before cited in our own reports, and he must have known that the whole title rested on a forfeiture, and the great effort of the complainant was to be relieved as far as possible from that forfeiture.

It seems to me, therefore, that it was entirely competent for either side to have adduced evidence at the hearing of any peculiar circumstances existing outside of the record which affected the question thus raised.

The complainant should have shown any excuse which it had for its failure to fulfill the covenants, but contented itself with alleging the fact, which was admitted by the answer, that the railroad was never intended for, and never was in fact used as a passenger road, and upon the absence of any proof or contention on the part of the defendant that his predecessors in title had ever requested complainant to specifically perform those covenants.

The defendant was at liberty to prove any facts or circumstances tending to show that it was not inequitable or unjust for him to insist upon the forfeiture provided for in the deed to the extent of obtaining compensation under the condemnation proceedings for additions and improvements put upon the property by the complainant while in lawful and undisturbed possession under the conveyance of his predecessors in title.

It is further urged that it is impossible to apply the principles upon which the *Booraem* decision was based in the present

case, because the rule laid down in that and kindred cases for the appraisal of damages was the value of the land at the time of the original entry, with interest from the date of taking possession.

But this is a mere rule for the ascertainment of value and damages, and not a part of the rule itself.

The essence of the rule is that the owner shall not have pay for the improvements put upon the premises by the railroad company before the condemnation proceedings were taken. It does not include any particular rule for the admeasurement of the damages which the railroad company should pay.

That rule must depend upon the particular circumstances of the case. And I interpret the language of the learned judge, in speaking of it, as so implying.

Its applicability to the cases where it has in practice been applied is manifest. But I thought, at the time the motion was before me to direct a special award and verdict, that it did not apply here, and I still think so. In fact, I doubt whether it is ever applicable where there has been a change in title and circumstances.

Mr. Hume, prior to the partition proceedings never thought it worth while to enforce the forfeiture, but was content to have the right of re-entry sold by the master in partition for the insignificant sum of $687. And the predecessors in title of the defendant never saw fit to enforce it.

It was treated as a mere right of re-entry.

The defendant purchased in October, 1899, and in less than three months thereafter commenced this suit in ejectment and recovered. Now, manifestly, it would be unjust to go back and ascertain the value of the land and incidental damages at the date of the conveyance to the complainant and give interest thereon to this date to the defendant. His title arises out of the forfeiture, and commenced in 1899. I thought when the bill was first presented to me that it was equitable and just that the complainant should pay such a sum as would represent the value of the premises at that time as if they had never been used for railroad purposes, with incidental damages to the adjoining land of the owner.

When the order directing what I will call the double award and verdict was advised, counsel for the defendant was heard, and he did not object to that mode of determining the damages if the value of the improvements and additions were not to be included.

Upon the whole, then, I think that he ought not to object to that mode.

Upon the question whether the complainant must pay the incidental damages as well as the value of the strip, I feel constrained to hold against it.

I will therefore advise a decree upon that basis, its terms to be settled on motion.

With regard to costs, I think the complainant is entitled to costs. Its position and conduct in this court has been in accordance with its principles, and it has substantially succeeded. It is true that in its supplemental bill it asked this court to ignore the findings of the jury and ascertain the amount to be paid in its own way, but no proceedings were had under that prayer and the defendant incurred no expense by reason of its insertion in the bill. Complainant is also entitled to a counsel fee.

I cannot take leave of this subject without saying that my study of it has led me to doubt the propriety of my imposing upon the complainant, as a term of granting it *interim* relief by injunction, the taking of condemnation proceedings, and to incline me to the opinion that this court ought, in this case, to have undertaken the ascertainment of the damages incurred by the defendant by reason of the failure to perform the covenants in the deed by its own methods.